### A. R. BARNES & CO. et al. v. BERRY et al.

(Circuit Court, S. D. Ohio, W. D. February 1, 1908.)

#### No. 6,295.

1. TRADE UNIONS—COMMITTEES—POWER TO CONTRACT.

The 1904 convention of the International Printing Pressmen and Assistants' Union instructed its board of directors to "negotiate" with the Typothetæ for an eight-hour workday. The convention of 1905 instructed its board of directors to secure "if possible" a workday of eight hours; and the convention of 1906 instructed its board of directors "to secure a renewal of the agreement" then existing, which provided for a nine-hour day "with the declaration as to whether the eight-hour day would be agreed to." The directors under this authority executed a contract with the Typothetæ renewing the existing contract, and providing for a nine-hour day until January 1, 1909, and an eight-hour day thereafter during the life of the contract. The convention of 1907 refused to ratify this contract until the provision for an open shop was stricken out, and an amendment was inserted providing for nine hours' pay for the eight-hour day, to which the Typothetæ refused to agree. *Held*, that the board of directors of the union under the instructions given them by the convention of 1906 had no power to determine within what time after the expiration of the existing contract the eight-hour day should be inaugurated, and that the agreement so made was not binding on the union unless ratified.

2. SAME—STRIKE BENEFITS—PAYMENT—INJUNCTION.

Where a contract between the International Printing Pressmen and Assistants' Union and the United Typothetæ of America attempted to regulate the length of the work day, but did not fix the term of service nor prevent the members of the union from withdrawing from the service of the Typothetæ at any time whether with or without cause, the contract having been repudiated by the union, the courts had no power by injunction to restrain the officers of the union from paying strike benefits to members from a fund raised for that purpose in order indirectly to compel enforcement of the contract, and prevent the success of strikes inaugurated to compel the granting immediately of an eight-hour day.

Submitted on Final Hearing.
See 156 Fed. 72.

Henry Spalding, Dudley Taylor and C. B. Wilby, for complainants.
Kinkead, Rogers & Ellis, for respondents.

THOMPSON, District Judge. This suit was brought to prevent the violation of, and practically to enforce, the specific performance of an alleged agreement between two voluntary associations, namely, the United Typothetæ of America and the International Printing

Pressmen and Assistants' Union of North America. The complainants are members of the Typothetæ, and bring the suit on behalf of themselves and as representatives of the Typothetæ, and the defendants are sued as representatives of the union; Berry being the president and McMullen the secretary-treasurer of the union. The purpose of the agreement as therein set forth is to establish "between the employing printers of the United States and their pressmen and feeders uniform shop practices and fair scales of wages, settlement of all questions arising between them, and the abolition of strikes, sympathetic or otherwise, lockouts and boycotts"; and, among other things, it provides that:

"It is expressly agreed that until January 1st, 1909, fifty-four hours shall constitute a week's work; and that thereafter during the life of this contract forty-eight hours of eight hours a day shall constitute a week's work; arrangements, however, can be made locally to bring the forty-eight hours so that a Saturday half holiday can be enjoyed without over-time cost to the employer, it being distinctly understood that the employer is entitled to a forty-eight hour week fifty-two weeks in the year, except where legal holidays intervene."

The contract was drawn up and signed by committees of the two associations, and was ratified by a special convention of the Typothetæ, but was repudiated by the nineteenth annual convention of the union, held at Brighton Beach, N. Y., in June, 1907, which action of the convention was afterwards approved by the men of the union upon a referendum vote directing that the "eight-hour day" be inaugurated by the union on the 18th day of November, 1907.

The complainants claim, and the defendants deny, that the committee of the union was authorized by the convention of 1906 to make the contract without ratification by a convention of the union; and the questions to be considered in determining the controversy are: (1) Had the committee of the union full and final authority to make the contract? (2) If so, can performance thereof be enforced indirectly by enjoining the officers of the union from paying strike benefits, and from doing anything in furtherance of strikes?

First. The seventeenth annual convention of the union, held at San Francisco in June, 1905, adopted the following report of the committee on officers' reports, namely:

"We recommend that the board of directors be instructed to secure a conference with a committee of the National Typothetæ with a view of arranging, if possible, a workday of eight hours. Failing to make a satisfactory agreement, we recommend the board to be constituted a shorter workday committee to begin a campaign with a view of demanding the eight-hour day at the expiration of our agreement on May 1, 1907, and the board being instructed to report to the next convention."

In obedience to this instruction, the board of directors of the union for the year 1905 attended the convention of the Typothetæ at Niagara Falls, in September of that year, and met its executive committee, and, as stated in the president's report to the convention of 1906, every argument possible on the union side was presented in trying to have the Typothetæ agree on the date of its going into effect, but were met with the answer "that it was an inopportune time to present it on account of conditions existing that they were not able to have chang-

ed." Thereafter there was some correspondence between Higgins, the president of the union and chairman of its board of directors, and Macintyre, the secretary of the Typothetæ, concerning the matter, which ended on the part of the Typothetæ by the following letter from its secretary:

"New York, April 28, 1906.

"Mr. Martin P. Higgins, Charlestown, Mass.—My Dear Mr. Higgins:

"Answering your favor of April 11th, I am instructed by our National Executive Committee to state that the Committee decline to take up the consideration of an eight-hour workday, but will be pleased to appoint a Committee to confer with a similar Committee from the Pressmen's Union to consider the renewal, at its expiration of the agreement which now exists between our respective organizations.

"Sincerely yours, John Macintyre."

Thereafter Higgins, on behalf of the board of directors, made the following report to the eighteenth annual convention of the union, held at Pittsburgh in June, 1906, to wit:

"As the last convention delegated the question of the shorter workday to the board of directors, and with the correspondence as above, and their knowledge of affairs before them, they beg leave to report to the convention the following plan whereby some tangible method or course may be arrived at that will result in the adoption of the eight-hour day by the I. P. P. and A. U.

"(1) That this convention instruct the incoming board of directors to meet as a committee with a like committee on the part of the United Typothetæ of America, as explained in the letter to Mr. Macintyre under date of April 28th, herein mentioned, the committee on our part to strive with all power possible to have some concessions made by the Typothetæ towards having the eight-hour day established within reasonable time, in a manner that will warrant its adoption on mutual grounds as a finality, and an agreement with that intent be entered into; the committee on our part having power to sign up such an agreement, if the eight-hour day can be brought, within a reasonable time of attainment, if not, the committee to report back to our next convention, as provided in section 6 of this report.

"(2) That an assessment of 50 cents per month be levied upon all pressmen members monthly from January 1, 1906, until July 1, 1907.

"(3) That an assessment of 25 cents per month be levied upon all feeder or assistant members monthly during the same period.

"(4) That this fund be sent to the international secretary-treasurer monthly by the secretary of each local union, the same to be deposited in a different bank from that in which we deposit our regular funds, and the same to be known as the 'Shorter Workday Fund.'

"(5) The question of what year and date the eight-hour day shall be adopted, shall remain within the keeping of the incoming board of directors, they to report to the next convention in full their observations and judgments as to what our future course should be in setting a date for the adoption of the eight-hour day.

"(6) In view of the fact that our agreement with the United Typothetæ of America will not expire until May 1, 1907, the board of directors feel that the provisions of section 4 of this report would be the wisest course to follow, until at least another convention had followed the carrying out of the first three sections of this report, in order that an opportunity may be given the membership to understand our financial strength, as well as hearing from the incoming board of directors, a report of the work done by them during the year towards an amicable adjustment of the shorter workday, or eight-hour day, with the United Typothetæ of America.

"(7) The wisdom of the above course is in the estimation of the board of directors the safest and best way for us to proceed, that we may feel our way carefully towards accomplishing the greatest amount of progress along the eight-hour day program, of not only trying to place our membership upon an

eight-hour day basis, but the entire printing industry as well, in all sections where it is an industry of any importance, the same as was the nine-hour day in 1898.

"(8) In connection with our own efforts along the above lines, we should also court the aid and assistance of the other branches of the printing trade, in so far as trying to have an unity of purpose in placing the printing industry on an eight-hour basis as well as our membership in it.

"(9) While we would like to see our membership on an eight-hour basis, we should try with every means within our power of agitation and co-operation to bring the whole printing industry on an eight-hour basis, not forgetting the fact that this was accomplished when the nine-hour day was established in the printing industry.

"(10) The success achieved in our nine-hour day effort is possible in the adoption of the eight-hour day, and, while recent events in the printing industry have mooted this possibility, it is still within our rights and efforts to try at least along the lines adopted in bringing the printing industry to a nine-hour day basis in 1898.

"(11) The foregoing report is made in outline of what should be done by the membership towards acquiring the eight-hour day, and, while we all would like to·see it come as soon as possible, we should not attempt to enforce it with a strike until all other means had failed to secure it, and our finances and organization are made such that, in the event of failure to accomplish our desire along the lines of easy approach, we can leave the date of enforcing it within the keeping of those whom we elect to administer our affairs, and then, when they inform us what course we should pursue, we will know that the time has been carefully considered and our duty and finances will have to aid us in doing the rest."

On the sixth and last day of the convention of 1906, the committee on officers' reports made two reports in relation ·to the agreement with the Typothetæ and the "eight-hour day," both of which were adopted by the convention, and which, as shown by the official report of the proceedings of the convention, read as follows:

"U. T. A. Agreement.
"Page 30 of president's report.

"We, the Committee, recommend that the Board of Directors be instructed to meet with like Committee on the part of the U. T. A., with instructions to secure a renewal of the agreement with a declaration as to whether the eight-hour day will be agreed to."

"The Eight-Hour Day.
"Page 39 of president's report.

"The committee are pleased to coincide with the recommendation of the Board of Directors, inasmuch as they are of such a nature that the committee have seen fit to endorse the plan of assessment as formulated by the Board, and that we recommend that this convention declare in favor of the eight-hour day immediately after the expiration of the agreement now existing between the U. T. A. and the I. P. P. and A. U., provided it is not within the scope of possibilities of having same arranged amicably and equitably between the U. T. A. and I. P. P. and A. U. within a reasonable time after the expiration of the agreement now existing between these two respective organizations.

"The committee further recommend that steps be taken by the board of directors to act in conjunction with the other branches of the printing crafts for perfecting a plan whereby unity of action may be carried out in the adoption of the eight-hour day."

The action of the convention in adopting these reports was construed by the board of directors to invest them with full power to renew the old contract with a provision for the inauguration of the "eight-hour day" within a reasonable time after the expiration of the old contract,

and with that understanding they on the 8th day of January, 1907, signed the agreement in question, although it would not become operative until May 1, 1907. Controversy at once arose throughout the union as to whether or not they had exceeded their authority, and in the Nineteenth annual convention of the union, held at Brighton Beach, N. Y., in June, 1907, it was discussed during four of the six days of the sitting of the convention and ended in the adoption of the following resolutions, to wit:

"To the Officers and Members of the I. P. P. and A. U.:

"Whereas, our board of directors has renewed the agreement with the United Typothetæ of America, now, therefore, be it resolved that said agreement is hereby ratified and approved, provided the 'open-shop' clause is stricken out and the amendment is inserted providing for nine hours' pay for the eight-hour day. And be it further resolved that in the event the U. T. A. rejects these amendments, our board of directors are instructed to submit the question of the immediate inauguration of the eight-hour day to the referendum, said referendum to be taken thirty days after such rejection."

The Typothetæ refused to agree to the proposed modification of the agreement, and thereupon the question of the inauguration of the "eight-hour day" on November 18, 1907, was submitted to a referendum vote of the membership of the union, and was decided in favor of its inauguration on that day. A large majority of the union men voting were employed outside of the Typothetæ membership, but the vote applied to all employers of union labor in or out of the Typothetæ.

A persistent effort to secure the establishment of the eight-hour workday is evidenced by the action of four annual conventions of the union. The Cincinnati convention of 1904 instructed its board of directors to "negotiate" for an eight-hour workday; the San Francisco convention of 1905 instructed its board of directors to secure "if possible" a workday of eight hours; the Pittsburgh convention of 1906 instructed its board of directors "to secure a renewal of the agreement with a declaration as to whether the eight-hour day will be agreed to"; and the Brighton Beach convention of 1907 offered to ratify the contract of January 8, 1907, "provided the 'open-shop' clause is stricken out and an amendment is inserted providing for nine hours pay for the eight-hour day." It will be observed that the second report of the committee on officers' reports to the Pittsburgh convention in relation to the "U. T. A. agreement" and "the eight-hour day," above set forth, was not offered by that committee or adopted by the convention as an instruction to the board of directors, but as an approval of the plan of assessment formulated by the board of directors and as a declaration of the convention itself in favor of the inauguration of an "eight-hour day" immediately after the expiration of the agreement then existing, provided it was not within the scope of possibilities of having it amicably arranged between the two associations within a reasonable time after the expiration of the agreement then existing. The board of directors appointed or chosen by the San Francisco convention, in their report to the Pittsburgh convention, asked that convention to "instruct the incoming board of directors to meet as a committee with a like committee on the part of the United Typothetæ of America, * * * the committee on our part to strive with

all powers possible to have some concessions made by the Typothetæ towards having the eight-hour day established within a reasonable time, * * * and an agreement with that intent be entered into, the committee on our part having power to sign up such an agreement, if the eight-hour day can be brought within a reasonable time of attainment, if not, the committee to report back to our next convention, as provided in section 6 of this report"; but the only power given by the convention to the incoming board of directors was "to meet with like committee on the part of the U. T. A. with instructions to secure a renewal of the agreement with a declaration as to whether the eight-hour day will be agreed to." The Typothetæ had theretofore refused to consider the adoption of the "eight-hour day," and the convention of the union had declared in favor of its adoption immediately after the expiration of the existing agreement, unless the two associations could agree upon some reasonable time thereafter, and the directors were instructed to obtain from the Typothetæ a declaration as to whether it would agree to the "eight-hour day"; that is, whether the Typothetæ would consider the demand for it, and at some time agree to it. The directors were not authorized in securing the renewal of the existing agreement to add new terms thereto; nor were they instructed to determine what would be a reasonable time after the expiration of the existing agreement within which to inaugurate the "eight-hour day," nor were they empowered to conclude a new agreement with the Typothetæ. If they succeeded in securing the consent of the Typothetæ to the renewal of the old agreement, with a declaration as to whether or not the "eight-hour day" would be agreed to, the instructions given them would be fulfilled, and their only remaining duty would be to report their action to the next convention. In their report it would have been proper to recommend what action, in their opinion, should be taken by the convention, giving their reasons therefor, but, under the instructions given them, final action could be taken only by the convention. The board of directors exceeded its authority in permitting new matter to be added to the renewal agreement, and in assuming power to bind the union by the agreement entered into by them with the Typothetæ.

Second. If the board of directors were authorized to enter into the agreement on behalf of the union can performance thereof by the men of the union be enforced by injunction? The agreement is not a contract of employment between members of the Typothetæ and men of the union, but is a contract between the two associations for the purposes hereinbefore stated. We are not advised of the terms of the employment of union men by members of the Typothetæ, except as to hours of labor. So far as we are advised by the pleadings and the evidence, they might at any time, without breach of the contract of employment, withdraw from the service of the Typothetæ. It is not shown that they agreed to work for any definite time, nor is there any provision in the agreement between the two associations fixing the time of service, and if, therefore, they should, at any time, with or without cause, withdraw from the service of members of the Typothetæ, they would be within their rights. As heretofore stated, the agree-

ment was repudiated by the union at the Brighton Beach convention, and thereafter the men of the union, by a referendum vote, declared in favor of the inauguration of the "eight-hour day" on November 18, 1907, and its maintenance is now the established policy of the union, and the defendants, its officers, are charged with the duty of carrying it out, and pending the strikes incident thereto may the men employed by the Typothetæ be deprived of the advice and assistance of their officers and of strike benefits? The strike benefit fund is created by moneys deposited by the men with the general officers for the support of themselves and families in times of strikes, and the court has no more control of it than it would have over deposits made by them in the banks, and the attempt to enforce specific performance of the agreement by enjoining the officers from performing their functions cannot be entertained. The court will not by indirect methods compel the men to continue in the service of the Typothetæ and work nine hours a day. The agreement only requires that, if they work at all, they shall work nine hours a day. There is no agreement that they shall continue in the service of the Typothetæ until January 1, 1909.

The bill will be dismissed, at the complainants' costs.